**The Commonwealth of MASSACHUSETTS, Plaintiff,**

v.

**MYLAN LABORATORIES, et al., Defendants.**

**Civil Action No. 03–11865–PBS.**

United States District Court, D. Massachusetts.

Dec. 23, 2008.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

The Commonwealth of Massachusetts brings this case against nine pharmaceuti-

cal manufacturers [1] for allegedly causing Massachusetts to overpay for generic prescription drugs under the Massachusetts Medicaid Program ("MassHealth"). Massachusetts contends that the defendants caused such overpayment by fraudulently inflating the "Wholesale Acquisition Cost" ("WAC") and the "Average Wholesale Price" ("AWP") of twenty-seven covered drugs.

Massachusetts moves for partial summary judgment as to liability with respect to Count IV of the First Amended Complaint, its claim that the defendants violated the Massachusetts False Claims Act, Mass. Gen. Laws. ch. 12, § 5A *et seq.* The defendants jointly move for summary judgment as to Count IV, as well as to Massachusetts' claims based on common law fraud (Count I), the Massachusetts Medicaid False Claims Act, Mass. Gen. Laws ch. 118E, §§ 40–41 (Count III), and breach of the covenant of good faith and fair dealing implicit in the defendants' rebate agreements (Count VI).

After several hearings, a tutorial, and a review of the briefs and the extensive record, Massachusetts' cross-cutting motion for partial summary judgment as to Count IV [Docket No. 434] is **DENIED** on the ground that there is a disputed issue of fact concerning defendants' scienter. The defendants' joint motion for summary judgment [Docket No. 450] is **DENIED** except with respect to AWP-based claims. For the most part, the defendants' individual motions for summary judgment will be addressed separately.

## II. BACKGROUND

The following facts are drawn from the extensive record. The Court also assumes knowledge and incorporates by reference its prior order on the defendants' motion to dismiss, *Massachusetts v. Mylan Labs.*, 357 F.Supp.2d 314 (D.Mass.2005), and its numerous opinions in the related multidistrict litigation, *In re Pharm. Indus. Average Wholesale Price Litig*, 263 F.Supp.2d 172 (D.Mass.2003), *In re Pharm. Indus. Average Wholesale Price Litig*, 307 F.Supp.2d 196 (D.Mass.2004), *In re Pharm. Indus. Average Wholesale Price Litig*, 230 F.R.D. 61 (D.Mass.2005), *In re Pharm. Indus. Average Wholesale Price Litig*, 233 F.R.D. 229 (D.Mass.2006), *In re Pharm. Indus. Average Wholesale Price Litig*, 460 F.Supp.2d 277 (D.Mass.2006), *In re Pharm. Indus. Average Wholesale Price Litig*, 478 F.Supp.2d 164 (D.Mass. 2007). Unless noted, the facts are undisputed.

## A. Medicaid Reimbursement

The Medicaid program is a federal-state program that provides medical assistance to low income individuals. MassHealth is the Commonwealth's component of the Medicaid program. MassHealth, like all state Medicaid agencies, must act in accordance with a State Plan, which the federal Centers for Medicare and Medicaid Services ("CMS") must review and approve annually. (Defs.' Joint Statement of Undisputed Material Facts [Docket No. 452] ("Defs.' SOF") ¶ 2.) Among other things, MassHealth reimburses "providers," such as doctors or pharmacies, for prescription drugs dispensed to insureds. The reimbursements are based on formulae set out in the Commonwealth's regulations, which

---

1. The Defendants are Mylan Laboratories, Inc. ("Mylan"); Ivax Corporation ("Ivax"); Warrick Pharmaceuticals Corporation ("Warrick"); Watson Pharmaceuticals, Inc. ("Watson"); Schein Pharmaceutical, Inc. ("Schein"); Teva Pharmaceuticals USA, Inc. ("Teva"); Par Pharmaceutical, Inc. ("Par"); and Purepac Pharmaceutical Co. ("Purepac"). Watson has acquired Schein. Roxane Laboratories, Inc. ("Roxane"), had been a defendant in this case, but has since settled with the Commonwealth.

were developed in accordance with federal requirements.

### 1. *Federal Regulations*

Under federal Medicaid regulations, a state Medicaid program's payments for a drug may not exceed the "estimated acquisition cost" of the drug plus a reasonable dispensing fee, where the "estimated acquisition cost" ("EAC") is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." 42 C.F.R. § 447.301 (2006). Federal regulations require that the reimbursements be sufficient to enlist enough providers to provide MassHealth insureds with access equal to that of the rest of the population. *See* 42 C.F.R. § 447.204 (2006).

Federal regulations also required that payment for drugs not exceed the Federal Upper Limit ("FUL"). 42 C.F.R. § 447.331 (2007).

The Medicaid Act further requires that a Medicaid Plan's payment rates and any changes to those rates be set by a "public process," in which the proposed rates and justification for the proposed rates are published, providers and other interested parties are given reasonable opportunity for review and comment, and the final rates, methodologies underlying the establishment of rates, and justification for the final rates are also published. The Commonwealth established its Medicaid payment rates through a public regulatory process and its rates are published in the Code of Massachusetts Regulations.

To set a FUL, CMS groups together a drug's therapeutically equivalent versions and sets an upper limit on payment for that group. (Donohue Tutorial [Docket No. 514–2] ¶ 26.) Each version of the drug has several associated published prices, such as an AWP, a WAC, and a Direct Price ("DP"). (*Id.*) To set a FUL for a class of drugs, CMS finds the lowest of these prices for any member of the class and multiplies it by 150%. (*Id.*)

### 2. *The State Standard*

The drugs at issue here are generic non-innovator "multiple-source drugs." These are drugs with at least three manufacturers or suppliers. (Donohue Tutorial ¶ 26.) MassHealth based reimbursement for these drugs on the lowest of the following:

(a) the Federal Upper Limit ("FUL") for the drug, if one is available, plus a dispensing fee;

(b) the Massachusetts Upper Limit ("MUL") for the drug, if any, plus a dispensing fee;

(c) the Estimated Acquisition Cost ("EAC") of the drug, plus a dispensing fee; or

(d) the pharmacy's usual and customary charge ("U & C") for the drug.

114.3 Mass.Code Regs. 31.04 (2007).

Prior to 2003, the MUL was calculated identically to FUL.[2] (Donohue Tutorial at ¶ 29.) In 2003, Massachusetts regulations were changed to reduce the multiplier from 150% to 130%. *See* 114.3 Mass.Code Regs. 31.02 (2007). This change was driven not only "to generate additional savings," but also to keep compensation "sufficient to assure participation by pharmacies in the program." (Klemeyer Decl. [Docket No. 453] Ex. 10 (Jeffrey Dep. 95:8–20, June 14, 2007).)

Massachusetts regulations define EAC as "an estimate of the price generally and

---

**2.** MUL is sometimes referred to (and is interchangeable with) the Maximum Allowable Cost ("MAC"). 114.3 Mass.Code Regs. 31.02 (2007).

currently paid by eligible pharmacy providers for the most frequently purchased package size of a drug." 114.3 Mass.Code Regs. 31.02 (2007). Prior to 1989, Massachusetts based EAC on the AWP reported by manufacturers for each drug. Subsequently, the regulations defined EAC to be the drug's WAC plus a percentage; prior to August 3, 2002, EAC was defined as WAC plus 10%; since then, EAC has been defined as WAC plus 6%. (Commonwealth's Mem. Supp. Summ. J. 5.) While some other states also calculate EAC by adding a percentage to WAC, most states calculate EAC by subtracting a percentage from AWP. (Donohue Tutorial ¶ 30.)

Finally, prior to 1995, U & C had been defined as the usual and customary charge paid by retail or cash payors, and did not include the (often lower) amounts paid by large institutions. (*Id.* ¶ 38.) Since 1995, Massachusetts regulations have defined U & C as "[t]he lowest price that [a pharmacy] charged or accepted from any health insurer or pharmacy benefit manager for the same quantity of a drug dispensed to a Massachusetts resident on the same date of service." 114.3 Mass.Code Regs. 31.02 (2007). According to testimony made at the public hearing regarding this change, the definition of U & C was made to "insure that [MassHealth] would receive the absolute best deal any retail pharmacy would offer." (Klemeyer Decl. Ex. 22 (Public Hearing Statement 114.3 CMR 31.00: Prescribed Drugs at 3).) By changing the definition, the Commonwealth was attempting to get for itself the best deal that a private insurer had obtained from a pharmacy. (*Id.*) In the same testimony, however, it was made clear that the state believed that "there are situations where EAC may be lower," and it was necessary to include EAC in the reimbursement formula "to insure that public payors get the lowest available price." (*Id.* at 5.)

### 3. *Payment of Medicaid Claims*

During the relevant period, the Commonwealth utilized a Medicaid Management Information System ("MMIS") which is used to process and maintain records concerning Medicaid claims (Commonwealth's Statement of Undisputed Material Facts Applicable to All Defs. ("Cmwlth.'s SOF–All") [Docket No. 436] ¶ 31) in conjunction with the Commonwealth's Pharmacy Online Processing System ("POPS"), which allows pharmacies to submit their claims electronically (*Id.* ¶ 33). The pharmacist submits a claim to the state through POPS for every prescription filled. On the claims form, there is a field called "billed amount"; pharmacists are instructed to fill this field with their U & C. (Klemeyer Decl. Ex. 9 (Jeffrey Dep. 84:18–85:16).) As early as 1992, when Massachusetts providers submitted paper claim forms, providers were required to submit a U & C, and the form required the provider to "certify that the information entered on the form is correct" by signing the form. (Def. Mylan's Statement of Undisputed Material Facts [Docket No. 459] ¶¶ 69–70.) The provider still must submit a U & C and certify "the accuracy and truthfulness of all data, information, reports, books, and records submitted." (*Id.* ¶ 73.) The claim is then submitted electronically and processed.

Upon submission of a claim, the computer system automatically applies the claims processing algorithm, based on the applicable regulation, determining and paying out the lowest of: a) the FUL plus a dispensing fee; b) the MAC plus a dispensing fee; c) the EAC plus a dispensing fee; or d) the U & C. (Cmwlth.'s SOF–All ¶ 34.) In certain cases, reimbursement exceeded the EAC and the FUL; the Commonwealth admits that it is unable to explain these discrepancies. (Commonwealth's Resp. to Defs.' SOF ¶ 122.)

The Commissioner of the Commonwealth's Division of Health Care Finance and Policy ("DHCFP"), in testimony to the Legislature, revealed that 16% of generic drug claims in July 2002 were paid based on U & C while 74% were paid on the basis of EAC. (Klemeyer Decl. Ex. 28 (Report to the General Court, Reimbursement for Prescribed Drugs at 4).)

In order to calculate EAC, the system relied on published pricing lists. The defendants, like all manufacturers, supply AWPs and WACs to third party publishers which publish pricing lists organized by drug. MassHealth used pricing information supplied by publisher First DataBank ("FDB"). The system would calculate EAC based upon WACs reported by FDB times a factor, such as 1.1. Some defendants did not report WACs to FDB for certain drugs; FDB, in turn, would not publish a WAC for that drug. When FDB did not report a WAC for a drug, MassHealth's algorithm would instead calculate EAC based upon AWP times a factor, such as 0.848.

This AWP-based proxy was utilized to approximate WAC in calculating EAC. (Commonwealth's Resp. to Def. Par's Statement of Undisputed Material Facts ("Par's SOF") [Docket No. 509] ¶ 29.) From 1989 through 2002, AWP minus 10% was used to calculate EAC. From 2002 until the end of the relevant period, AWP minus 12% was used. (Par's SOF [Docket No. 456] ¶ 30.) From the early 1990s, the Commonwealth instructed FDB to calculate this proxy; from 1998 until 2003, MassHealth or its fiscal intermediaries would calculate it. (Commonwealth's Resp. to Par's SOF ¶ 31.) The Commonwealth did not inform the defendants about the use of a proxy. (Id. ¶ 32.) The Commonwealth points out, though, that it furnished drug manufacturers on a quarterly basis with invoices stating how many pre-scriptions had been reimbursed, the number of units, and the total dollar amount reimbursed. (Id.) When FDB did not publish a WAC, MassHealth did not attempt to obtain prices through surveys or contacting the manufacturer directly. (Par's SOF ¶ 28.) In the Commonwealth's view, such surveys would not be feasible, given that it reimburses for more than 15,000 different pharmaceutical products. (Commonwealth's Resp. to Par's SOF ¶ 28.) A proxy was necessary because when a drug did not have a WAC, the computer pricing algorithm used by the Commonwealth could not run. (Id. Additional Facts ¶ 1.)

#### 4. *WAC Defined*

Effective April 1, 2003, for the first time, DHCFP defined WAC in the Massachusetts regulations; it defined WAC as

> a manufacturer's price published in a national price compendium or other publicly available source. Where no published price is identified as the WAC, the WAC is equal to the wholesale net unit price as published by First Data Bank. If no wholesale net unit price is published the WAC is equal to the lower of the direct price or an adjusted average wholesale price.

(Par's SOF ¶ 33.) Prior to that, the regulations did not set forth a reimbursement rate based on AWP. (Id.)

### B. The Individual Defendants

#### 1. Par

Massachusetts asserts that Par published false prices for seven National Drug Codes ("NDCs"): one each for Ibuprofen (600 mg) and Ibuprofen (800 mg) and five for Ranitidine (150 mg). (Commonwealth's Statement of Undisputed Material Facts Applicable to Par [Docket No. 439] ("Cmwlth.'s SOF–Par") ¶ 7.)

At drug launch, Par would set an AWP for the drug and report it to FDB. (Par's

SOF ¶ 20.) Par's AWPs had no correlation to the actual prices charged; instead, they were set 10% below the AWP of the bioequivalent brand, in order to get the drug identified as a generic in the price compendia. (Def. Par's Resp. to Cmwlth.'s SOF–Par [Docket No. 483] ¶ 14.) Eventually, Par would adjust the drug's AWP based upon competitors' AWPs. (*Id.* ¶ 15.) Significantly, although Par frequently invoiced sales at WAC, approximately 90% of sales were made for less than WAC. (Def. Par's Resp. to Cmwlth.'s SOF–Par ¶ 16.)

Par would also set a WAC, but it would not supply it to FDB because, it claims, competing manufacturers could use it to determine Par's contract prices. (Par's SOF ¶¶ 21–22.) Nevertheless, Par admits it would provide its WACs to anyone who asked. (*Id.* ¶ 23.) Par typically set a drug's WAC at 20% below the WAC for the bioequivalent brand, but competition quickly drove it down. (Commonwealth's Resp. to Par's SOF ¶ 21.)

FDB would obtain Par's WACs from other sources and publish them (Commonwealth's Resp. to Par's SOF ¶ 24.) Par claims that when it would discover that FDB was publishing its WACs, it would instruct FDB to zero out the field. (Par's SOF ¶ 25.) Par told FDB it had a policy not to publish its WACs and claims that it believed FDB understood its policy. (*Id.* ¶ 26.) However, the Commonwealth has presented evidence that Par knew that FDB continued to publish Par's WACs and that others relied upon them. (Cmwlth.'s SOF–Par Ex. 5 (Andrus Dep. 100:3–21, 111:14–113:22, Oct. 16, 2007) (testimony of Par employee that Par would periodically get reports from FDB that included Par's WACs); *Id.* Ex. 13 (A September, 2003, e-mail from FDB to Par listing their prices for Par products, including WACs); *Id.* Ex. 14 (a September, 2004, e-mail exchange from FDB to Par listing Par's WAC prices, noting that numerous payers "are using WAC for reimbursement", and referencing an earlier conversation in which a Cardinal employee had asked a Par employee to update their WACs published by FDB).)

The Commonwealth's expert calculated the spreads between WAC and the actual average price that wholesalers paid to acquire Par's drugs for only some Par drugs and only for Q4 of 2002 and Q1 of 2003. For the one Ibuprofen NDC for which spreads were calculated, the spread was 152% in both Q4 of 2002 and Q1 of 2003. For the four Ranitidine HCL NDCs for which spreads were calculated, one had spreads of 91% and 86%, a second had spreads of 79% and 74%, a third had spreads of 71% and 66%, and the last had spreads of 576% and 628%. (Hartman Decl. [Docket No. 460] Attach. F.1.)

### 2. Ivax

Nine NDCs are at issue for Ivax: one for Baclofen (20 mg), and two each for Albuterol (90 mcg), Baclofen (10 mg), Clozapine (25 mg), and Clozapine (100 mg) (437–12). Ivax provided both WAC and AWP to FDB. (Commonwealth's Statement of Undisputed Material Facts Applicable to Ivax [Docket No. 437] ("Cmwlth.'s SOF–Ivax") ¶ 14.) Ivax's AWPs were unrelated to its actual sales prices; its WACs, while listed on wholesalers' invoices, were actually paid on fewer than 10% of sales. (Def. Ivax's Resp. to Cmwlth.'s SOF–Ivax [Docket No. 506] ¶¶ 19, 23.)

At least for Clozapine, Ivax claims that the Commonwealth was a direct purchaser and so knew the actual contract price for the drug.

Ivax presented a PowerPoint presentation to pharmacists regarding Clozapine that defined "spread" as "the difference

between reimbursement and net cost on scripts paid by Medicaid or PBM-interchangeable with profit." (Cmwlth.'s SOF–Ivax ¶ 46.) Ivax marketed the "spread" on Clozapine to encourage pharmacies to use its product. (Def. Ivax's Resp. to Cmwlth.'s SOF–Ivax ¶¶ 47, 50.)

The spreads between WAC and the actual average price that wholesalers paid to acquire Ivax's first Albuterol NDC typically exceeded 80%, ranging from –76% in Q3 of 1996 to 359% in Q4 of 1996. For the second Albuterol NDC, spreads ranged from –20% in Q4 of 2001 to 134% in Q4 of 1999. The first Baclofen NDC had spreads from –14% in Q3 of 2002 to 195% in Q1 of 2003. The second had spreads from –18% in Q3 of 2002 to 180% in Q1 of 2003. The third: from –12% in Q3 of 2002 to 2073% in Q1 of 1997. For Clozapine, one NDC had spreads from 17% in Q2 of 1998 to 190% in Q3 of 2000, a second had spreads from 14% in Q2 of 1998 to 182% in Q3 of 2000, a third from 14% in Q2 of 1998 to 179% in Q3 of 2000, and a fourth from 10% in Q2 of 1998 to 170% in Q3 of 2000. (Hartman Decl. Attach. F.1.)

### 3. Warrick

At issue are three Warrick drugs: Albuterol Sulfate (.083%), Albuterol Sulfate (.5%), and Albuterol (90 mcg) (Commonwealth's Statement of Undisputed Material Facts Applicable to Warrick [Docket No. 443] ("Cmwlth.'s SOF–Warrick") ¶ 5.) The state never reimbursed Warrick based on AWP. (Def. Warrick's Resp. to Cmwlth.'s SOF–Warrick [Docket No. 475] ¶ 11.) Warrick did not have WACs for its drugs; instead, FDB published Warrick's DPs as WACs. (*Id.* ¶ 19; *Id.* Additional Facts ¶ 2.) Starting in 2002, Warrick provided the state with a monthly report of its high-low range of contract prices for the drugs at issue. (*Id.* ¶ 10.)

Warrick would set an AWP at launch and then generally leave it untouched. (*Id.* ¶ 11.) Warrick also generally reported a DP at launch. (*Id.* ¶ 14.) Warrick reported a DP for at least one of the NDCs at issue directly to the Commonwealth, indicating that the "information is being provided in the event it is required for reimbursement purposes." (*Id.* ¶ 13.) Warrick claims that it did not maintain a uniform DP for its drugs, and that it asked FDB to delete DP listings for its drugs. (*Id.* ¶ 12.) Warrick claims it believed FDB had complied with its request, based on FDB's hard-copy publications which did not contain such information and because it was not aware of the content of FDB's electronic publications, which did. (*Id.* ¶ 21.) Warrick disputes the Commonwealth's claim that FDB periodically faxed Warrick a report listing its DPs as the WACs for its drugs and asking Warrick to verify its accuracy. (*Id.* ¶ 23.) Warrick, however, produced at least one fax from FDB to Warrick confirming the Commonwealth's claim. (Cmwlth.'s SOF–Warrick Ex. 10.)

Warrick claims that other Commonwealth programs purchased its drugs at prices below WAC. (Def. Warrick's Resp. to Cmwlth.'s SOF–Par Additional Facts ¶ 14.) Further, the Commonwealth's expert conceded that large spreads between AWP and the price of albuterol began to reach public awareness in 1996. (*Id.* Additional Facts ¶ 15.)

The spreads between WAC and the actual average price that wholesalers paid to acquire Warrick's three Albuterol NDCs ranged from 109% in Q1 of 1995 to 571% in Q2 of 2001, from 24% in Q3 of 1995 to 209% in Q1 of 2000, and from 97% in Q2 of 1996 to 690% in Q3 of 2000. (Hartman Decl. Attach. F.1.)

#### 4. Teva

For Teva, 16 NDCs are at issue: two for Carbamazapine (200 mg), two for Acetaminophen/Codeine (300/30 mg), three for Clonazepam (.5 mg), three for Clonazepam (1 mg), two for Clonazepam (2 mg), and one each for Sulfamethoxazole/ Trimethoprim, Naproxen (500 mg), Cephalexin (500 mg), and Amiodarone (200 mg). (Commonwealth's Statement of Undisputed Material Facts Applicable to Teva [Docket No. 442] ("Cmwlth.'s SOF–Teva") ¶ 5.) Teva reported WACs and AWPs to FDB at all relevant times (*Id.* ¶ 6); Teva disputes this (Def. Teva's Resp. to Cmwlth.'s SOF–Teva [Docket No. 502] ¶ 6), but the government has presented evidence that shows that it did (Cmwlth.'s SOF–Teva Ex. 5 (Krauthauser Dep. 178:22–179:11) (Testimony of Teva employee that, throughout the relevant time period, Teva reported "SWP and WAC or AWP/SWP and WAC" to the pricing compendia)).

At some point, Teva began adding a disclaimer to its price reports explaining that AWP did not represent the price actually paid by pharmacies; they did not issue a similar disclaimer with respect to WAC, which they claim was because WAC was their actual invoice price. (Def. Teva's Resp. to Cmwlth.'s SOF–Teva ¶ 14.) However, Teva's witnesses testified that fewer than 10% of Teva's sales were actually made at WAC. (Cmwlth.'s SOF–Teva Ex. 4 (Wodarczyk Dep. 160:14–21, Aug. 23, 2007); *Id.* Ex. 5 (Krauthauser Dep. 174:17–175:11).)

The spreads between WAC and the actual average price that wholesalers paid to acquire Teva's two Acetaminophen with Codeine NDCs ranged from 39% in Q1 of 2001 to 661% in Q2 of 2001 and from 22% in Q1 of 2001 to 623% in Q2 of 2001. For the two Carbamazepine NDCs, the spreads ranged from 53% in Q2 of 1996 to 181% in Q1 of 2000 and from 41% in Q2 of 1996 to 160% in Q1 of 2000. For Cephalexin, the spreads ranged from 120% in Q1 of 2002 to 405% in Q4 of 2002. For the eight Clonzepam NDCs, the spreads ranged from 32% in Q4 of 1996 to 1163% in Q3 of 1999, from 150% in Q1 of 1999 to 1128% in Q3 of 1999, from 139% in Q4 of 1999 to 1115% in Q3 of 1999, from 135% in Q4 of 1999 to 3940% in Q3 of 1999, from 123% in Q4 of 1999 to 3812% in Q3 of 1999, from 122% in Q4 of 1999 to 3774% in Q3 of 1999, from 29% in Q4 of 1996 to 2142% in Q2 of 1998, and from 119% in Q4 of 1999 to 1086% in Q2 of 2000. For Naproxen, the spreads ranged from 38% in Q1 of 1996 to 194% in Q1 of 2003. For Sulfamethoxazole/Trimethoprim, the spreads ranged from 23% in Q3 of 1998 to 296% in Q1 of 2000. No WAC-based spread was calculated for Amiodarone HCL. (Hartman Decl. Attach. F.1.)

#### 5. Mylan

At issue are eight NDCs: two for Lorazepam (.5 mg), three for Lorazepam (1 mg), one for Clozapine (100 mg), and two for Phenytoin Extended Release (100 mg). (Commonwealth's Statement of Undisputed Material Facts Applicable to Mylan [Docket No. 438] ("Cmwlth.'s SOF–Mylan") ¶ 3.) Mylan reported AWP and WAC to FDB throughout the relevant time period. (Def. Mylan's Resp. to Cmwlth.'s SOF–Mylan [Docket No. 496] ¶ 4.)

Mylan generally invoices its customers at WAC, but admits that individual pharmacies may contract with Mylan for less than WAC. (*Id.* ¶ 7.) The evidence indicates that Mylan never charged its customers AWP (Cmwlth.'s SOF–Mylan Ex. 5 (Roman Dep. 128:21–129:20, Aug. 2, 2007)), and that Mylan's WACs were not related to its contract prices (*Id.* Ex. 6 (Krinke Dep. 157:18–158:7, Sept. 25, 2007)).

Mylan argues that the Commonwealth knew the actual price of some of its drugs

based on its own contracts. (Def. Mylan's Resp. to Cmwlth.'s SOF–Mylan ¶ 11.)

The spreads between WAC and the actual average price that wholesalers paid to acquire Mylan's Clozapine ranged from 120% in Q2 of 2000 to 19488% in Q3 of 2002. For the five Lorazepam NDCs, the spreads ranged from 45% in Q2 of 1998 to 6853% in Q3 of 2000, from 38% in Q2 of 1998 to 6491% in Q3 of 2000, from 47% in Q2 of 1998 to 2632% in Q4 of 2000, from 40% in Q2 of 1998 to 2502% in Q4 of 2000, and from 39% in Q2 of 1998 to 2471% in Q4 of 2000. For the two Phenytoin Sodium NDCs, the spreads ranged from 38% in Q2 of 1999 to 10610% in Q1 of 2003 and from 34% in Q2 of 1999 to 10319% in Q1 of 2003. (Hartman Decl. Attach. F.1.)

### 6. Watson and Schein

Ten Watson NDCs are at issue in this case: three for Lorazepam (.5 mg), two for Hydrocodone with Acetaminophen (500 mg), two for Hydrocodone with Acetaminophen (750 mg), and one each for Necon (.035 mg), Labetalol HCL (200 mg), and Carisoprodol (350 mg). (Commonwealth's Statement of Undisputed Material Facts Applicable to Watson and Schein [Docket No. 444] ("Cmwlth.'s SOF–Watson") ¶ 5.) Eleven Schein NDCs are at issue: three for Carisoprodol (350 mg), two for Methylphenidate HCL (10 mg), two for Methylphenidate HCL (5 mg), one for Ibuprofen (600 mg), one for Ibuprofen (800 mg), two for Trazodone HCL (50 mg), and two for Trazodone (100 mg). (Id. ¶ 6.)

Before 2000, Watson reported only AWPs to FDB. (Id. ¶ 11.) In 2000, Watson switched from reporting AWP to reporting a "Suggested Wholesale Price" or "SWP". (Def. Watson's Resp. to Cmwlth.'s SOF–Watson [Docket No. 493] ¶ 8.) In 2000, it reported WACs for the Hydrocodone with Acetaminophen NDCs, the Necon NDC, and the Labetalol NDC; in 2002, it reported WACs for the Lorazepam NDCs. (Cmwlth.'s SOF–Watson ¶ 11.)

Prior to August 2000, when it was acquired by Watson, Schein generally reported WAC, AWP, and DP, which it provided to FDB (Def. Watson's Resp. to Cmwlth.'s SOF–Watson ¶¶ 14–15.) Following the acquisition, Watson did not change the WACs of the Schein drugs. (Id. ¶¶ 11, 16.)

Watson's WACs and AWPs were based primarily on the WACs and AWPs of its competitors. (Id. ¶ 28.) For an exclusive generic, Schein's AWPs were approximately 10% below the brand AWP and its WAC was set approximately 20 to 25% below that. (Id. ¶ 30.) For generics with competition, the AWP and WAC were generally based on competitors' AWPs and WACs. (Id.) Watson's employees testified that AWP "was most likely different than the price we charged the customer" (Id. ¶ 31), and that while some wholesalers were charged WAC (Id. ¶ 28), "[t]he WAC price is generally higher than the contract price." (Id. ¶ 32; Cmwlth.'s SOF–Watson Ex. 6 (Clark Dep. 106:13–17, June 28, 2007).)

Watson claims the Commonwealth has purchased its drugs at prices below WAC. (Def. Watson's Resp. to Cmwlth.'s SOF–Watson ¶ 34.)

The spreads between WAC and the actual average price that wholesalers paid to acquire three of Watson and Schein's Carisoprodol NDCs ranged from –52% in Q4 of 1998 to 2569% in Q4 of 2000, from 31% in Q3 of 2001 to 2355% in Q4 of 2000, and from –57% in Q4 of 1998 to 2436% in Q4 of 2000. No WAC spread was calculated for the fourth Carisoprodol NDC. For the four Hydrocodone with Acetaminophen NDCs, the spreads ranged from 11% in Q3 of 2001 to 565% in Q1 of 2001, from 103% in Q2 of 2001 to 466% in Q1 of 2001, from 27% in

Q3 of 2001 to 115% in Q2 of 2002, and from 18% in Q3 of 2001 to 99% in Q2 of 2002. For the two Ibuprofen NDCs, the spreads ranged from 9% in Q4 of 1998 to 147% in Q1 of 2002 and from –7% in Q4 of 1998 to 114% in Q2 of 1999. For Labetalol HCL, the spreads ranged from –3% in Q3 of 2001 to 182% in Q4 of 2001. For the three Lorazepam NDCs, the spreads ranged from 13% in Q4 of 2002 to 209% in Q1 of 2003, from 8% in Q4 of 2002 to 193% in Q1 of 2003, and from 7% in Q4 of 2002 to 190% in Q1 of 2003. For the four Methylphenidate HCL NDCs, the spreads ranged from 7% in Q1 of 1996 to 443% in Q4 of 1999, from 9% in Q4 of 1997 to 416% in Q4 of 1999, from 33% in Q4 of 1997 to 945% in Q4 of 1999, and from 16% in Q2 of 1998 to 777% in Q4 of 1999. For Necon, the spreads ranged from 13% in Q2 of 2001 to 171% in Q2 of 2002. For the four Trazodone HCL NDCs, the spreads ranged from 41% in Q1 of 1997 to 2020% in Q1 of 2003, from 24% in Q1 of 1997 to 1779% in Q1 of 2003, from 33% in Q3 of 2001 to 666% in Q3 of 2000, and from 30% in Q1 of 1997 to 668% in Q3 of 2000. (Hartman Decl., Attach. F.1.)

### 7. Purepac

Ten Purepac NDCs are at issue: two for Lorzepam (.5 mg), two for Lorazepam (1 mg), two for Isosorbibe Mononitrate SR (30 mg), two for Clonazepam (.5 mg), and two for Clonazepam (1 mg). (Commonwealth's Statement of Undisputed Material Facts Applicable to Purepac [Docket No. 440] ("Cmwlth.'s SOF–Purepac") ¶ 5.)

Purepac reported WACs and AWPs at all relevant times. (*Id.* ¶ 6.) Purepac invoiced wholesalers at WAC (Def. Purepac's Resp. to Cmwlth.'s SOF–Purepac [Docket No. 488] ¶ 9), but its WACs and AWPs were independent of its contract prices (*Id.*).

Purepac claims that the Commonwealth purchased its drugs at prices below WAC. (*Id.* ¶ 14.)

The spreads between WAC and the actual average price that wholesalers paid to acquire Purepac's four Clonazepam NDCs ranged from 82% in Q1 of 1998 to 3405% in Q2 of 2001, from 69% in Q1 of 1998 to 3404% in Q2 of 2001, from 74% in Q1 of 1998 to 2103% in Q2 of 2001, and from 62% in Q1 of 1998 to 2103% in Q2 of 2001. For the two Isosorbide Mononitrate NDCs, the spreads ranged from 103% in Q2 of 1999 to 1671% in Q1 of 2003 and from 99% in Q2 of 1999 to 1635% in Q1 of 2003. And the spreads for the four Lorazepam NDCs ranged from 86% in Q3 of 1998 to 1098% in Q2 of 2002, from 76% in Q3 of 1998 to 1036% in Q2 of 2002, from 85% in Q3 of 1998 to 828% in Q4 of 2001, and from 76% in Q3 of 1998 to 784% in Q4 of 2001. (Hartman Decl. Attach. F.1.)

## III. DISCUSSION

### A. *Standard of Review*

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36–37 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving

party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.' " *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.' " *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. *Count IV: The False Claims Act*

Subsection 5B of the Massachusetts False Claims Act ("MFCA") creates liability for any person who "(1) knowingly ... causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof; . . . ." Mass. Gen. Laws ch. 12, § 5B. These provisions are modeled after the similarly worded §§ 3729(a)(1) and (2) of the Federal False Claims Act ("FCA"). As such, Massachusetts Courts will look for guidance in interpreting the MFCA to cases and treatises interpreting the FCA. *Scannell v. Attorney General*, 70 Mass.App.Ct. 46, 49 n. 4, 872 N.E.2d 1136, 1138 (2007).

■ To establish liability under section 1 of the MFCA in this case, the Commonwealth must prove that:

a) The defendants caused to be presented to the Commonwealth a claim for payment;

b) The claim was false or fraudulent;

c) The defendants knew that the claim was false or fraudulent;

d) The false aspect of the claim was material. *See United States v. President & Fellows of Harvard Coll.*, 323 F.Supp.2d 151, 178–194 (D.Mass.2004).

■ To establish liability under section 2 of the MFCA, the Commonwealth must prove that:

a) The defendants made a "statement to get a false or fraudulent claim paid or approved by the [Commonwealth]";

b) The statement made or used was false or fraudulent;

c) The defendants knew that the statement was false;

d) The false or fraudulent statement was material, *see id.* at 194;

e) The defendants intended that the false statement be material to the Commonwealth's decision to pay or approve the false or fraudulent claim. *Allison Engine Co. v. United States ex rel. Sanders*, — U.S. ——, 128 S.Ct. 2123, 2126, 170 L.Ed.2d 1030 (2008).

The Commonwealth does not need to prove that the Commonwealth was damaged. 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.01[A][4] (3d ed.2006); *see also United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995) ("the [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.' ")

### 1. The Meaning of 'WAC'

Whether or not the claims at issue are false hinges on the meaning of "WAC". Massachusetts contends that WAC is meant to reflect the prices paid by wholesalers for drugs; since the reported WACs did not do so, they do not represent a

"true" price. Specifically, Massachusetts asserts that the WACs reported did not include pre-sale discounts, rebates, chargebacks, prompt-pay discounts, or other discounts that reflected the *actual* price paid for drugs. Defendants concede that the WACs reported do not include such discounts, but argue that this did not make WACs "false" prices. Instead, the defendants contend that WAC represented within the industry an *"undiscounted* list price . . . without regard to class of trade." (Def's Joint Mem. Supp. Summ. J. 1) (emphasis added).

Since 1989, WAC has been part of Massachusetts' regulatory scheme. WAC, itself, has gone undefined until recently. WAC has been used, however, as part of the definition of EAC, with EAC defined as WAC plus a certain percentage, first 10% and then 6%. EAC, in turn, has been defined as "an estimate of the price generally and currently paid by . . . eligible pharmacy providers for the most frequently purchased package size of a drug." 114.3 Mass.Code Regs. 31.02 (2007).

■ The agency's interpretation of its regulation must be given considerable deference. Courts "only disturb an agency's interpretation of its own regulation if the 'interpretation is patently wrong, unreasonable, arbitrary, whimsical, or capricious.'" *Town of Falmouth v. Civil Service Comm'n*, 447 Mass. 814, 857 N.E.2d 1052, 1058 (2006).

■ Defendants insist that WAC is a term of art, understood in the industry to be nothing more than an undiscounted list price. "The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." *United States v. Lachman*, 387 F.3d 42, 50 (1st Cir.2004). "To be

sure, there are instances where a statutory or regulatory term is a technical term of art, defined more appropriately by reference to a particular industry usage than by the usual tools of statutory construction." *Id.* at 53. "However, this canon of construction requires the disputed term to actually be a technical term of art." *Id.* And "[b]y definition, a term must have an established and settled meaning to constitute a term of art." *In re. Pharm. Indus. Average Wholesale Price Litig.*, 460 F.Supp.2d 277, 285 (D.Mass.2006).

The evidence produced by the Commonwealth and the defendants demonstrates that WAC either did not have an established and settled meaning, and thus was not a term of art, or it was a term of art, but a term of art that meant "the actual cost at which wholesalers acquired a given drug."

In an article published in "Health Care Financing Review," put out by the U.S. Department of Health and Human Services, the authors define "AWP" as "[t]he manufacturer's suggested wholesale price to the retailer," but define WAC as "[t]he wholesaler's net payment made to purchase a drug product from the manufacturer, net of purchasing allowances and discounts." (Heidlage Decl. [Docket No. 479] Ex. 6 ("State Medicaid Pharmacy Payments and Their Relation to Estimated Costs" at 4).) The 1994–95 FDB Blue Book defines AWP as "either the published suggested wholesale price obtained from the manufacturer/labeler or the price commonly charged by wholesalers as determined by survey" and WAC as the "[p]rice to wholesaler or distributor." (*Id.* Ex. 7 at 1.) The Medi–Span Master Drug Data Base Documentation Manual, released in December of 1996, defines WAC as "the estimated cost to the wholesaler by the drug manufacturer. . . . Actual values can vary from these estimated values as

wholesalers experience discounts through volume purchases or special deals causing variance from their standard costs." (*Id.* Ex. 8 at 2.) FDB's National Drug Data File Documentation Manual from October of 1998 defines the Net Wholesale Unit Price as "the price per unit that a manufacturer charges a wholesaler." (*Id.* Ex. 9 at 3.) In an August 2004 report done by Abt Associates for CMS, WAC is defined as

> a list price used for invoices between drug manufacturers and wholesalers ... typically used as a benchmark for all classes of trade without adjustment for discounts, rebates, purchasing allowances, or other forms of economic consideration.... *In the past decade, WAC was a term that typically included adjustments for discounts, rebates, purchasing allowances, or other forms of economic consideration. More recently, WAC has come to mean a list price before any form of price adjustment....* [D]ue to different levels of discounts across drug products and specific classes of trade, the WAC does not generally have a reliable relationship to the actual acquisition cost.... If WAC is to be used to estimate a price from wholesaler to provider ... an adjustment must be made to account for the wholesaler ... operating cost and a reasonable profit.

(*Id.* Ex. 10 at 2) (emphasis added). A 2001 presentation document by Schering Laboratories defines WAC as "the amount paid by wholesalers for a product," as opposed to AWP which "is neither the average price nor a price charged by wholesalers.... Used primarily for benchmarking." (*Id.* Ex. 11 at 1.) In the AWP litigation, Independent Expert Professor Ernst R. Berndt's February 2005 report to this Court referred to WAC as "a reasonably decent approximation to actual retail pharmacy acquisition costs...." (*Id.* Ex. 12 at 2.)

Defendants point to a January, 1994 GAO report as evidence that WAC was an "undiscounted price"; but that report defines WAC as "the factory price for most of the outpatient prescription drug market: the 55 percent of the market served by wholesalers who do not receive discounts from manufacturers and the substantial share of the managed care market segment that also does not receive such discounts"; that is, while WAC does not include discounts, WAC is a price off which discounts were not given to the majority of purchasers. (Defs.' Reply to Commonwealth's Resp. to Defs.' SOF [Docket No. 554] ¶ 21; Klemeyer Decl. Ex. 4 ("Prescription Drugs: Companies Typically Charge More in the United States Than in the United Kingdom" at 18–19).) Defendants also point to two articles in support of their understanding of WAC: a 1997 book by Stuart Schweitzer points out that neither AWP nor WAC "captures actual transaction prices, including discounts and rebates" (Defs.' Reply to Commonwealth's Resp. to Defs.' SOF ¶ 21; Occhuizzo Decl. [Docket No. 529] Ex. 5 ("Pharmaceutical Economics and Policy" at 11).) Another book from 1997 refers to WAC as "denot[ing] the ex-factory charge, before discounts, to the wholesaler" (*Id.* Ex. 6 ("Elements of Pharmaceutical Pricing" at 33).) The amount and type of discounting referred to in the articles are not clear.

The defendants, remarkably, attack the Commonwealth's examples as "disregard[ing] evidence regarding WACs in the generic, as opposed to the brand, market" (Defs.' Reply to Commonwealth's Resp. to Defs.' SOF ¶ 21), but then of their three above-mentioned sources, one specifically notes that it is "focusing on brand-name drugs" (Klemeyer Decl. Ex. 4 at 17–18), and two appear not to distinguish between generic and brand markets (Occhuizzo Decl. Ex. 5 at 11; *Id.* Ex. 6 at 3). The

defendants' citation to the testimony of FDB employee Kay Morgan lends some credence to their position, defining WAC as "a list price that does not include discounts." (Defs.' Reply to Commonwealth's Resp. to Defs.' SOF ¶ 24; Occhuizzo Decl. Ex. 10 (Morgan Dep. 84:13–85:22, Aug. 27, 2007).) However, she also defines WAC as the number used to communicate "to the trade that this is now the price of this product," which seems to suggest that WAC is a signal for the real price. (*Id.* Ex. 10 (Morgan Dep. 85:9–12).)

Defendants have also produced evidence that they, at least, used WAC as an invoice price and charged at least some customers WAC. (Defs.' Reply to Commonwealth's Resp. to Defs.' SOF ¶ 25 (collecting evidence).)

Thus while there is evidence that certain sources at certain times understood WAC to be an undiscounted list price, there is at least as much evidence that WAC meant "the actual cost at which wholesalers acquire a drug." Given the different understandings of WAC, WAC did not have an established and settled meaning in the industry as a term of art meaning "an undiscounted list price."

The Court, then, must determine the plain language meaning of WAC. The dictionary meanings of its constituent parts are quite straightforward: "wholesale" is defined as "of, relating to, or engaged in the sale of goods or commodities in quantity for resale." *Webster's Third New International Dictionary of the English Language* (3d ed.1961) (1993 prtg). "Acquisition" means "the act of acquiring or gaining possession." *Random House Webster's College Dictionary* (1992). "Cost" means "the price paid to acquire, produce, accomplish, or maintain anything." *Id.* This stands in interesting contrast to "price" which means "the sum or amount of money or its equivalent for which anything is bought, sold, *or offered for sale.*" *Id.* While "price" might possibly include, without a modifier, a notion of "list price," "cost" does not; it is "the price *paid* to acquire" the drug. Combining all of the terms, "wholesale acquisition cost" plainly means "the price paid to acquire goods in quantity for resale." It does not mean a list price; it means the amount that goods actually cost.

Strengthening this interpretation is the fact that it is consistent with the rest of the statute and the statute's purpose. "The 'cardinal rule [is] that a statute is to be read as a whole . . ., since the meaning of statutory language, plain or not, depends on context.'" *Doyle v. Huntress, Inc.*, 419 F.3d 3, 14 (1st Cir.2005) (quoting *Conroy v. Aniskoff*, 507 U.S. 511, 515, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993)). In this regulatory scheme, context is quite telling: WAC is used to determine EAC. EAC is defined in the regulation as "an estimate of the price generally and currently paid by . . . eligible pharmacy providers for the most frequently purchased package size of a drug." 114.3 Mass.Code Regs. 31.02 (2007). EAC is meant to estimate what pharmacies *actually pay* for drugs. WAC plus a percentage is used to calculate EAC. Thus WAC must be the type of thing that is amenable to being used to estimate what pharmacies actually pay for drugs. The price that wholesalers *actually pay* for drugs is just such a term; simply add a percentage adjustment to account for the wholesalers' overhead and profits and, *voila*, you can estimate what pharmacies actually pay for drugs. If, on the other hand, WAC were understood to mean merely a list price, a price set by manufacturers and listed at the top of invoices but rarely paid by wholesalers, then WAC could not be used to accurately estimate what pharmacies actually pay for

drugs without significant additional information.

The regulatory scheme makes the agency's purpose quite clear: it utilized four separate cost caps to ensure that MassHealth's payments for drugs were generally kept under control (through FUL and MUL) and generally approximated what others paid for the drugs (EAC plus a dispensing fee and U & C). Given that EAC was calculated based on WAC, understanding WAC to be what wholesalers actually paid to acquire the drugs furthers this purpose. Understanding WAC as a mere list price does not. When the regulatory scheme is viewed as a whole, it is clear that WAC must mean "the actual cost at which wholesalers acquired a drug." *See Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co.*, 295 F.3d 68, 74 (1st Cir.2002).

Finally, understanding WAC as a mere list price does more than simply fail to serve the agency's purpose; it leads to an absurd result. " 'Literal' interpretations which lead to absurd results are to be avoided." *Summit Inv. and Development Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir.1995). Even were the Court somehow convinced that the "literal" meaning of WAC was what defendants reported, either because of the plain meaning of the term or because it was supposedly a term of art, that interpretation would need to be avoided, given the absurdity that would result. Under the defendants' definition, MassHealth "would be surrendering all control over Medicare fiscal responsibility by anchoring Medicare reimbursement to a metric that is wholly dictated by the pharmaceutical industry." *In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F.Supp.2d at 286. The idea that the agency "would deliberately condone a bribery scheme using public funds to enrich drug manufacturers and [others] is, to say the

least, unusual." *In re Lupron Mktg. & Sales Practices Liti.*, 295 F.Supp.2d 148, 163 (D.Mass.2003) (footnote omitted). The suggestion that the Commonwealth "intended to give the pharmaceutical industry free reign over drug pricing" is absurd. *In re. Pharm. Indus. Average Wholesale Price Litig.*, 460 F.Supp.2d at 287. The defendants' interpretation of WAC would give the defendants a virtual blank check because they could simply denominate a price as a WAC even if it was not the real price charged to most wholesalers, and the Commonwealth would then compensate on the basis of that "list price." Such a result is absurd and fortifies the conclusion that, even were deference not due to the agency, WAC means "the price that wholesalers actually paid to acquire the drug."

## 2. Falsity of Reported WACs

Despite WAC's plain meaning, for most of the drugs at issue, the defendants in this case reported numbers that were far, far higher than the price that most (if not all) wholesalers actually paid. For most of the drugs at issue, the reported numbers were multiple times the price actually paid by most wholesalers; some numbers reported by the manufacturers were more than ten times the amount actually paid; some, more than a hundred. Even viewing the facts in the light most favorable to the defendants, and drawing all reasonable inferences in their favor, there is sufficient evidence for a jury to find that the defendants' WACs were false for those drugs where WACs were not true prices paid by most wholesalers. However, the Commonwealth must address falsity drug-by-drug.

## 3. Submission of False Claims

 Although the defendants do not submit claims to the Commonwealth directly, the defendants can be liable if they cause claims for payment to be presented

to the Commonwealth or make statements to get claims paid by the Commonwealth. The FCA reaches "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544–545, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Under a broad interpretation of the FCA, "a defendant may be liable if it operates under a policy that causes others to present false claims to the government." *United States v. President & Fellows of Harvard Coll.*, 323 F.Supp.2d 151, 187 (D.Mass.2004). "As most courts agree, the FCA covers indirect bilking of the federal government." *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F.Supp.2d at 16.

■ Here, the defendants reported false prices to MassHealth via the publishing compendium knowing that pharmacies would present claims to MassHealth which will be reimbursed based on a formula that utilizes the inflated price to determine the appropriate reimbursement amount. *See In Re Pharmaceutical Indus. Average Wholesale Price Litig.*, 478 F.Supp.2d 164, 173 (D.Mass., 2007). Thus, although the manufacturers do not themselves submit claims to the Commonwealth, and the claims do not themselves contain WACs or AWPs, the claims here were "predicated on an underlying fraudulent pricing scheme." *Id.* The defendants are thus chargeable with causing false claims to be presented to the Commonwealth.

■ The issue of knowing submission is more complicated for Par. The evidence shows the following: although it used WACs, Par refused to give WACs to the publishing compendia. However, FDB reported WACs for Par's drugs, which it would glean from other sources. Par

knew that FDB was reporting Par's WACs for its drugs. (Cmwlth.'s SOF–Par Ex. 5 (Andrus Dep. 100:3–21, 111:14–113:22) (testimony of Par employee that Par would periodically get reports from FDB that included Par's WACs).) When Par would see that FDB was reporting its WACs, Par would request that FDB "zero those prices out." (*Id.*) Par was aware of numerous occasions where FDB, despite Par's instructions, continued to publish Par's WAC prices. (*Id.*)

The Commonwealth contends that given FDB's practices, and the importance of WAC for reimbursement, Par could not have believed that FDB would actually cease reporting WAC. When all reasonable inferences are drawn in the Commonwealth's favor, a fact-finder could reasonably believe that Par knew that FDB continued to publish WACs for its drugs. Given the structure of the industry, and the fact that FDB had authority to report Par's AWP, a jury could reasonably find that FDB had "apparent authority" to report Par's WACs, and thus that further action was required before Par would cease to be accountable for FDB's reporting. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Restatement (Third) of Agency* § 2.03 (2006). "An agent's apparent authority may survive or linger after the termination of actual authority because apparent authority is present when a third party reasonably believes that the agent is authorized to take action and the belief is traceable to a manifestation made by the principal." *Id.* at § 3.11, cmt. c. "Apparent authority protects third parties who interact with an agent on the basis of the principal's prior manifestation

and who lack notice that the agent's actual authority has terminated." *Id.* "A principal's duty is said to be one to take 'appropriate steps' to destroy the lingering appearance of authority." *Id.* at § 3.11 n.e. "A well-known industry custom may also make it reasonable for a third party to believe that an agent has authority even though, unbeknownst to the third party, the principal has restricted the agent's authority, shrinking it below the industry norm." *Id.* at § 2.03 cmt. d. Particularly, given the sparse briefing, the Court denies both motions for summary judgment on the claim that Par is liable for knowingly causing false claims to be submitted to the Commonwealth.

Warrick attempts to raise a similar argument, but its attempt is not on a par. In 1993, when confronted with publication of its DPs in FDB's hard-copy publications, Warrick asked FDB to delete them. (Def. Warrick's Resp. to Cmwlth.'s SOF–Warrick ¶ 13.) Warrick claims it did not know that FDB continued to publish WACs for its drugs because Warrick was only aware of the content of FDB's hard-copy publications, and FDB only published WACs for Warrick's drugs in its electronic publications. Warrick, however, produced a fax from FDB to Warrick of FDB's 1999 National Drug Data File Product Update, listing Warrick's drugs and their WACs. (Cmwlth.'s SOF–Warrick Ex. 10.)[3] Further, FDB's Patricia Kay Morgan testified that while FDB does not have a policy of routinely requesting updated information from manufacturers, FDB would, from time to time, send manufacturers the information FDB was publishing, including WACs, and request that the manufacturer approve and update its information. (Warrick's Klemeyer Decl. [Docket No. 476] Ex. 16 (Morgan Dep. 38:5–25, Jan. 28, 2002).)

Warrick itself seemed to view DPs and WACs similarly. One witness defined DP as "the price at which we invoice an account" and WAC as "[ a] n undiscounted invoice price." (Warrick's Klemeyer Decl. Ex. 1 (Weintraub Dep. 153:24–154:1, 156:14–25).) FDB's National Drug Data File notes that DP is reported separately from WAC only when manufacturers sell directly to providers, and where the direct price "is different from the wholesale price." (Cmwlth.'s SOF–All Ex. 6 at 2–27.) As Warrick has pointed out, it did not typically use the term "WAC". (Def. Warrick's Resp. to Cmwlth.'s SOF–Warrick Additional Facts ¶ 2.) Warrick refers to its DP as "Direct Wholesale," indicating that Warrick presented its DPs as its wholesale prices. (Cmwlth.'s SOF–Warrick Ex. 8.) To put it simply, when viewing the facts in the light most favorable to the Commonwealth, Warrick knew FBD was reporting the WACs for its drugs.

### 4. U&Cs

The defendants have also argued that because the U & Cs reported by the pharmacies in the billed amount section of the claim submitted to MassHealth were false in certain circumstances, the defendants cannot be charged with submitting false claims. Professor Morton, the defendants' expert, testified that she believed that U & C should have been the lowest of FUL, MUL, EAC, and U & C, and thus the amount on which reimbursement was

---

**3.** Warrick claims that the fax is inadmissible evidence because it "is not addressed to anyone in particular, no one has authenticated it, and the Commonwealth cannot show that anyone at Warrick ever saw it." (Def. Warrick's Resp. to Cmwlth.'s SOFWarrick ¶ 23.)

The Commonwealth is not, however, attempting to admit the fax for the truth of the contents, but only to prove that Warrick had knowledge that its WACs were being published. The document, having been produced by Warrick, is admissible for this purpose.

based, in most instances. (Evidentiary Hr'g Tr. 84–85, May 6, 2008.) Her testimony was based on her understanding of WAC as an undiscounted list price, not as the price at which wholesalers actually acquired the drug. (*Id.* at 77.)

Morton has suggested in her testimony that the pharmacies were lying about their U & Cs to MassHealth, based on the minutes of a Pharmacy Advisory Board Pharmacy Association Meeting revealing that prior to 2005, a verbal agreement existed with MassHealth that MassHealth would not audit generic U & C prices "due to variations in MACs and the difficulties in tracking." (*Id.* at 85, 110.) MassHealth officials testified that they believed that requiring pharmacies to report U & C as defined by the regulation would hold down costs (Evidentiary Hr'g Tr. 6–8, May 13, 2008.) As such, defendants urge the Court to conclude that pharmacies must have been lying about their U & Cs because most pharmacies were reimbursed based on inflated WACs. As an initial matter, this evidence of possible fraudulent U & Cs is simply insufficient to support the defendants' motion for summary judgment or to defeat the Commonwealth's motion for summary judgment. As discussed above, "[t]here must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is *merely colorable or is not significantly probative,* summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505) (emphasis added).

■ More fundamentally, even if most of the U & Cs were false, that would not stop the defendants from being chargeable with causing false claims to be submitted. The FCA attaches "liability upon *presentment* of a false or fraudulent claim, rather than *actual payment* on that claim." *United States ex rel. A + Homecare, Inc.*

*v. Medshares Mgmt. Group, Inc.,* 400 F.3d 428, 445–446 (6th Cir.2005). The Supreme Court has described the FCA as covering "all fraudulent *attempts* to cause the Government to pay out sums of money." *United States v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968). Just as "[i]t is irrelevant that [the person who actually submitted the claims] ... is totally innocent," *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 440 (E.D.N.Y. 1995), it would not be dispositive here if the pharmacies were also guilty. The claims for payment here were paid on the basis of four figures: FUL, MUL, EAC, and U & C. When the defendants published false WACs, they insured that any claims for reimbursement for their drugs would be false. Assuming the pharmacies subsequently lied about their U & Cs when they submitted their claims, their actions did not cut off liability for the defendants. However, if the true U & C were lower than a true WAC, the defendants would only be liable for the amount of reimbursement in excess of the true WAC. The pharmacies would be liable for the spread between the true U & C and the true WAC.

## 5. AWP Reporting Only

■ Some defendants at some times did not report WAC to FDB, and only reported AWP. Just as elsewhere in this multidistrict litigation, these AWPs were not true prices. *In re Pharm. Indus. Average Wholesale Price Litig.,* 478 F.Supp.2d at 173–174.

The defendants argue persuasively that because EAC was defined in terms of WAC and not AWP, they did not know that AWP would be used as a grounds for reimbursement by MassHealth, and thus they did not knowingly cause the submission of false claims. The Commonwealth's

regulations stated that "[t]he EAC shall be the drug wholesaler's acquisition cost (WAC) plus [x] percent." Further, the Commonwealth did not inform the defendants about the use of a AWP-based proxy to estimate WAC. It is true that the defendants received from the Commonwealth on a quarterly basis invoices stating how many prescriptions had been reimbursed, the number of units, and the total dollar amount reimbursed, but there is insufficient evidence in the record to find that the defendants understood they were being reimbursed on the basis of an EAC calculated using their AWPs (rather than U & C, FUL or MUL). Thus the Defendants' motion for summary judgment on Count IV must be granted as to the claims submitted during the periods of time in which they published only AWP and not WAC.[4]

### 6. Government Knowledge

The defendants contend that the Commonwealth had knowledge that WACs were false, and that this provides a defense to liability under the False Claims Act.

Government knowledge could conceivably be relevant to two elements of the False Claims Act: the falsity of the claim and the defendant's state of mind. As to falsity, "there appears to be an emerging consensus (not without significant authority to the contrary) that it is not negated by government knowledge." 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.03[F] (3d ed.2008). The Ninth Circuit has stated that "what constitutes the offense is not intent to deceive but knowing presentation of a claim that is either 'fraudulent' or simply 'false'. . . . That the relevant government officials know of the falsity is not in itself a defense." *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991). Numerous other courts have concurred. *See United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d Cir.1993); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir.2002); *Tyger Constr. Co. v. United States*, 28 Fed.Cl. 35, 60 (Fed.Cl. 1993); *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218, 223 (D.Md.1995).

Even those cases that have found government knowledge to negate the element of falsity have required that the government possess knowledge of the actual true facts of the claim, not simply knowledge that the claim is generally false; some have further required that the government actually approve of those true facts. For example, the Seventh Circuit found "the government's knowledge effectively ne-

---

4. Undiscussed by either party is the fact that the statutory scheme does not reimburse solely on the basis of EAC, but rather by calculating the lowest of four possible payments: EAC, FUL, MUL, and U & C, and that FUL and MUL were based in part on AWP. FUL and MUL were not based on each individual drug's AWP, but instead on the lowest published price for a drug in each drug's class. Arguably, in some circumstances, had the defendants reported true AWPs, the AWP would have been the lowest published price for a drug in that drug's class, and thus formed the basis for the drug's FUL and MUL. For instance, in Q3 of 1996, the AMP for Par's Ibuprofen (600 mg) was approximately $.015. The reported AWP, however, was approximately $.15. The FUL was $.04740. It would seem that, had Par reported a truthful AWP of approximately $.015, the FUL would have been set at 150% of that amount, approximately $.0225. In that case, a true AWP could have led in numerous instances to the FUL or MUL being the lowest of the remaining figures. However, the intricacies of the FUL-setting process have not been fully explained to the Court and this case is too massive and complicated to generate new theories of liability at this late stage.

gates the fraud or falsity required by the FCA" where "the government knows and approves of *the particulars of a claim* for payment before that claim is presented...." *United States ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542, 545 (7th Cir.1999) (emphasis added). That is, there can be no falsity where "[t]he government knew what it wanted, and ... got what it paid for." *Id.* Further, these cases also seem to rely on the fact that the government *approves* of the false claim, finding no falsity only where it is alleged that "the government was defrauded by the very activities its agents ordered" and that the defendant somehow "defraud[ed] the government by following the government's explicit directions." *Id.*

Similarly, while some courts have found that government knowledge can prevent the defendant from forming the requisite state of mind (knowing that the claim is false or fraudulent), they have done so only where the government's knowledge as to the true facts is extensive and in some cases where the government has actively approved of the underlying facts. According to the Tenth Circuit, "there may ... be occasions when the government's knowledge of or cooperation with a [defendant's] actions is *so extensive* that the [defendant] could not as a matter of law possess the requisite state of mind to be liable under the FCA." *Shaw v. AAA Eng'g & Drafting, Inc.,* 213 F.3d 519, 534 (10th Cir.2000). Likewise, the Fourth Circuit held that "the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation"; specifically, that the government's *"full knowledge of the material facts* underlying [a defendant's representations] ... negates any knowledge that [the defendant] had regarding the truth or falsity of those representations." *Becker,* 305 F.3d at 289 (emphasis added). For instance, where

the defendant and the government "so completely cooperated and shared all information," claims could not be knowingly false. *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d 321, 327 (9th Cir.1995).

Similarly, some courts have found that where the defendant has disclosed the true facts underlying a claim, the defendant cannot be said to know that the claim is false. As one court put it, a defendant's

> disclosure ... to the government is relevant, not because government knowledge of a misrepresentation shields a [defendant] from liability, but because evidence of disclosure may "point[ ] persuasively away from any conclusion that [the defendant] made a knowing misrepresentation." In other words, disclosure ... may establish that the defendant did not "knowingly" submit false claims....

*United States v. Newport News Shipbuilding Inc.,* 276 F.Supp.2d 539, 564 (E.D.Va. 2003). That "the government knew of [the defendant's] mistakes and limitations, and that [the defendant] was open with the government about them, suggests that ... [the defendant] was not cheating the government...." *Wang v. FMC Corp.,* 975 F.2d 1412, 1421 (9th Cir.1992).

### 7. The Defense

Defendants vigorously contend that the government knew that WACs were not true prices in four different ways. First, they seek to attribute the knowledge of two of the Commonwealth's agencies regarding steep generic drug discounts to the Commonwealth generally. What the State Office of Pharmacy Services ("SOPS") and the Group Insurance Commission ("GIC") might have known, however, does not definitely establish the knowledge of the Commonwealth's Division of

Health Care Finance and Policy ("DHCFP").

■ As a general matter, the knowledge of one agency of a government is not imputed to another agency of that government. Only "if there is some relationship between the agencies-either some reason for the agency without knowledge to seek the information or a reason for the knowledgeable agency to transmit the information" will one agency's knowledge be imputed to another. *In re Agent Orange Product Liability Litig.*, 597 F.Supp. 740, 796 (D.C.N.Y.1984). With the exception of certain circumstances not applicable here, "a truly independent ... agency should not be charged with knowledge of what another is doing simply because both are components of the same ... government." *Id.* (quoting *J.A. Jones Const. Co. v. United States*, 182 Ct.Cl. 615, 390 F.2d 886, 891 (Ct.Cl.1968)).

Here, SOPS and GIC merely had information about the price for which they, themselves, could purchase pharmaceuticals either through a PBM or a group purchasing organization. They had no duty to transmit this knowledge to DHCFP. DHCFP was a separate agency, and thus even were the knowledge of SOPS and GIC sufficient to mount a government knowledge defense (which it is not), their knowledge will not be imputed to the Commonwealth.

The defendants stridently insist that the top officials in the government knew throughout the relevant time period that WACs were not true prices. In a 2002 report, the Health and Human Services Office of the Inspector General ("OIG") reported that pharmacies paid 30.55% below WAC for generics, and concluded that "[t]he results of our review show that WAC was not a true wholesale acquisition price...." (Klemeyer Decl. Ex. 27 ("Medicaid Pharmacy—Actual Acquisition Cost of Brand Name Prescription Drug Products") at 7.) Although the Commonwealth came to know that the WACs for generic drugs were false in certain respects beginning in 2001 or 2002, there is scant-to-no evidence that the government earlier possessed knowledge of the true facts underlying the alleged false claims. Defendants have presented absolutely no evidence that the government approved them before 2002.

Similarly, Defendants have presented no evidence that the Commonwealth knew that the spreads for drugs were almost frequently greater than 50 percent, consistently in the hundreds, and frequently in the thousands, or that the defendants ever disclosed the actual underlying facts to the government. Indeed, Arnold Shapiro, the Commonwealth's Assistant Pharmacy Provider Manager (and later Pharmacy Provider Manager) from 1988 to 1999, Gary Gilmore, the program's Deputy Pharmacy Director from 1997 to the present, and Paul Jeffrey, the Commonwealth's Pharmacy Director since 2001, all believed WAC was a true representation of the cost for a drug. Defendants highlight the testimony of Jeffrey, the Commonwealth's 30(b)(6) designee, that he knew that WAC wouldn't include discounts and rebates. However, that testimony reflected his understanding at the time of the deposition. (Commonwealth's Resp. to Defs.' SOF ¶ 77.) That is not surprising since by 2001 and 2002, the Commonwealth began to understand that there were significant discounts off of WAC.

Defendant also points to the testimony of Douglas Lapp, who became an analyst in the Commonwealth's Division of Health Care Finance and Policy (DHCFP) in the summer of 2000 who testified that he never understood WAC to be an actual market price. However, the knowledge of one government official in 2000 alone will not

as a matter of law support a government knowledge defense because he never testified that he knew the extent of the spreads or approved them. The other snippets of testimony relied on by defendants are similarly unhelpful and misleading in that they do not demonstrate knowledge before 2001 or 2002.[5] "Government knowledge" by key government employees thus provides no silver pill for the defendants.

Third, defendants also point out that the Commonwealth had direct knowledge of the fraud as the result of a Medicaid fraud meeting in 1998. On March 19, 1998, the National Association of Medicaid Fraud Control Units held its annual conference, which included a presentation by the representatives of Ven–A–Care; an Assistant Attorney General in the Medicaid Fraud Control Unit was present at the conference. (*Id.* ¶ 109.) The Attorney General's Office received a notebook of materials from Ven–A–Care which contained information regarding allegedly fraudulent pharmaceutical pricing and reimbursement practices, and drug and company specific information, including information on Albuterol. (*Id.* ¶¶ 110–11.)

The Commonwealth argues that the claims related primarily to AWP price reporting for physician administered injectable drugs, not at issue in this action, which involves self-administered generic drugs and the binder did not represent that the problems were applicable to all manufacturers and all drugs. (*Id.* ¶ 111.) Although the binder indicated that the fraud affected AWP and WAC, including Warrick's .085% albuterol sulfate solution, the binder also states that the "scheme involves a narrow category of pharmaceuticals: infusion, injectable and inhalation drugs and biologicals," which were generally not available in a retail community pharmacy and are generally administered by a nurse, physician, or respiratory therapist. (*Id.* ¶ 114.) In the binder are letters concerning prices from Dey and Warrick with regard to Albuterol and a letter from Schein with regard to a product not at issue here. (*Id.* ¶ 115.) The binder also includes Ven–ACare's costs for Albuterol. (*Id.* ¶ 116.)

Defendants also point to testimony of an Ivax rep that he met with Massachusetts Medicaid officials in 1998 or 1999 and informed them that Clozapine could be purchased for significantly less than AWP. (Defs.' Reply to Commonwealth's Resp. to Defs.' SOF ¶ 28.) While this evidence may well be relevant to the start date for the statute of limitations on these specific drugs (Albuterol and Clozapine), it does not support an across-the-board government knowledge defense because there is no evidence of government sanction. To the contrary, the purpose of the meeting was to alert government officials to possible fraud. That the government responded lethargically to the knowledge of fraud does not translate into approval.

Finally, the defendants point out that Massachusetts had actual direct knowledge that WACs were not true market prices because officials could "reverse engineer" the actual price paid based upon the "Average Manufacturer Price" ("AMP") that

---

**5.** Defendants point to the testimony of David Sibor, the Commonwealth's Affiliated Computer Services representative, but his testimony supports only the rather unsurprising fact that he *currently* understands WAC not to include discounts. (Defs.' Reply to Commonwealth's Resp. to Defs.' SOF ¶ 21; Heinz Decl. Ex. Q) (Sibor Dep. 154:21–155:20.)

Defendants also cite the testimony of MassHealth's Vic Vangel, but his testimony was actually that, for generics, WAC was not "clearly defined," and he was simply "not sure" what the acquisition cost of generics was. (Occhuizzo Decl. Ex. 9) (Vangel Dep. 22:2–19, June 27, 2007.)

manufacturers reported to the federal government. AMPs are used to determine federal matching funds for a manufacturer's covered drugs, in accordance with Rebate Agreements which manufacturers enter into with the federal government under the Medicaid Best Prices Statute, 42 U.S.C. § 1396r–8. *See* 42 U.S.C. § 1396r–8(a)(1). AMP is defined as "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade" which "includes cash discounts and allowed all other price reductions." (Defs.' SOF ¶ 23); 42 U.S.C. § 1396r–8 (k)(1). All of the defendants entered into rebate agreements with the federal government and were required to calculate and report AMPs to CMS' Secretary on a quarterly basis. (Defs.' SOF ¶¶ 21–22); 42 U.S.C. § 1396r–8(b)(3)(A)(i). These AMPs were not to be revealed to third parties. (Defs.' SOF ¶ 25.)

 CMS used AMPs to calculate the "unit rebate amounts" ("URAs") "to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment due." (Defs.' SOF ¶¶ 26–30.) For the generic drugs at issue here, the URA was calculated as 11% of AMP; for brand drugs and innovator multiple source drugs, the URA was at least 15% of AMP. (*Id.* ¶ 28.) Following calculation, CMS would report the URAs to the states, including Massachusetts. (Commonwealth's Resp. to Defs.' SOF ¶ 29.) Since 1991, Massachusetts has been aware of the content of the Rebate Agreements. (Defs.' SOF ¶ 31.) While the defendants claim that Massachusetts knew that it could determine AMPs from URAs (*Id.* ¶ 32), the Commonwealth denies that it knew it could do so during the relevant time period. The Commonwealth further argues that AMPs cannot be determined from URAs for single-source drugs

and innovator multiple source drugs, and, in light of the requirement for a public process for setting payment rates and the confidentiality of the AMPs, the Commonwealth could not have used (and did not believe it could use) AMPs to set reimbursement rates. (Commonwealth's Resp. to Defs.' SOF ¶ 32.)

While the Commonwealth admits it would take only a few seconds to turn URAs into AMPs, it denies that it ever did such calculations until it began investigating this case (*Id.* ¶¶ 34–35), and Jeffrey's testimony supports this claim. (Heidlage Decl. Ex. 5 (Jeffrey Dep. 114:2–115:21, June 14, 2007).) Again, even if you didn't need Einsteinian quantitative skills to discover the fraud, the Commonwealth's failure to do so does not equate to government knowledge or approval. Therefore, at least with respect to the period before 2002, a government knowledge defense does not fly as a matter of law. With respect to the post–2002 period, a government knowledge defense is viable because the government decided to continue using WACs as a policy matter.

### 8. Materiality

The Commonwealth must also prove that the defendants' falsehoods were material. The First Circuit has not directly held that the FCA contains a materiality requirement. *See United States v. Data Translation, Inc.,* 984 F.2d 1256, 1267 (1st Cir.1992). However, many courts have determined that it does. 3C O'Malley, Grenig, & Lee, *Federal Jury Practice and Instructions* § 178.20, notes (5th ed.2001). Further, courts in the First Circuit have proceeded to address it. *United States v. President and Fellows of Harvard Coll.,* 323 F.Supp.2d 151, 181–182 (D.Mass.2004). This Court, too, will address the question of materiality.

■ The defendants argue that the Commonwealth is not entitled to summary judgment here because "a falsehood or misrepresentation must affect the government's ultimate decision whether to remit funds to the claimant in order to be 'material,'" and this "outcome materiality" test "requires proof that the government would have acted differently had it known of the false statement." Since the Commonwealth has not shown that it would have acted differently had it known of the false statement, the defendants argue, the Commonwealth is not entitled to summary judgment.

While some courts have held that the false statement must be a "prerequisite to payment" of the claim, other courts have held that the false statement merely need be the type of statement that is "capable of influencing" the government's decision (that is, the falsehood must be potentially relevant to the decision). 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.04[E] (3d ed.2006). This second definition, or "natural tendency" test, has been used in this district, *see President & Fellows of Harvard Coll.*, 323 F.Supp.2d at 181–182 ("[w]hether a false statement is material depends on whether it 'has a natural tendency to influence agency action or is capable of influencing agency action' "), and appears to be the better test. Speaking in the context of other statutes relating to false statements, the Supreme Court has noted that "[i]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (internal quotation marks omitted); *see also United States v. Wells*, 519 U.S. 482, 489, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (stating that the Court "understand[s] the term ['materiality'] ... to mean" the same thing).

Such a standard of materiality not only comports better with the common understanding of the term "material," but it also has the additional benefit that it "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916–917 (4th Cir.2003).

> Such a standard is more consistent with the plain meaning of the statute, which attaches liability upon *presentment* of a false or fraudulent claim, rather than *actual payment* on that claim.... Furthermore, evaluating materiality based on the potential effect rather than actual result is more consistent with the underlying purpose of the FCA. The United States Supreme Court has broadly interpreted the statute to cover "all fraudulent *attempts* to cause the Government to pay out sums of money."

*United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445–446 (6th Cir.2005) (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)).

Under this standard here, defendants cannot prevail on their argument that the false statements were not material. Reporting false WACs had a natural tendency to influence the Commonwealth's actions, by inflating the amounts used to compute EAC, and thus potentially the amount of the Commonwealth's payment. There is no genuine issue as to the materiality of the defendants' false statements when they reported WACs.

### 9. The Defendants' Knowledge of Falsity

The Commonwealth must prove that the defendants knew that the claim was false

or fraudulent. The MFCA defines "knowing" as "possessing actual knowledge of relevant information, acting with deliberate ignorance of the truth or falsity of the information or acting in reckless disregard of the truth or falsity of the information." Mass. Gen. Laws ch. 12, § 5A(a). The defendants have produced testimony that they believed in good faith that WACs were merely an invoice price and that they used it as such, as well as some evidence that other sources understood WAC the same way. That being said, with spreads that were almost always greater than 50%, consistently greater than 100%, sometimes greater than 1000%, and occasionally greater than 10000%, many of the defendants' WACs could hardly even be called true *list* prices; undoubtedly a consumer would be surprised to find that most purchasers could acquire a car for one-half the sticker price, let alone for a hundredth of it.

Numerous sources within the industry defined WAC as the price wholesalers actually paid for the drug. Significantly, the practice of FDB was to report its WACs under the heading "WHLNET" or "WHN" or "WNU" where the "WHL" or "WH" or "W" stood for "Wholesale" and the "NET" or "N" or "NU" stood for "Net Unit". (Cmwlth.'s SOF–Warrick Ex. 10; Cmwlth.'s SOF–Watson Ex. 14; Cmwlth.'s SOF–Par Ex. 13 (Faxes from FDB to Warrick, Watson, and Par listing their WACs under the heading "WHLNET"); Cmwlth.'s SOF–Teva Ex. 6 (Cioschi Dep. 108:2–109:7, Feb. 12, 2008) (testimony that Teva was a customer of FDB and thus could monitor WAC through their publications); Cmwlth.'s SOF–Ivax Ex. 5 (Sarfas Dep. 254:12–256:18, Aug. 22, 2007) (Ivax received yearly FDB requests to make sure database was up to date).) It is hard to see how a Wholesale Net Unit Price could be understood not to be *net* of "rebates" and "discounts".

Furthermore, having entered into the rebate agreements, the defendants were required, as a matter of law, to familiarize themselves with the legal requirements, standards and procedures of the Medicaid program. *Heckler v. Community Health Servs.*, 467 U.S. 51, 63–65, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). These include the procedures and legal requirements applicable to reimbursements. *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir.2001). The defendants were required to know that the Commonwealth's EAC was "the agency's best estimate of the price generally and currently paid by providers." Knowing that WAC was used to calculate EAC, and that EAC was meant to estimate what pharmacies actually pay for drugs, a jury could certainly conclude that the defendants knew or were deliberately ignorant of the fact that they were not meant to report a mere list price, a price set by manufacturers and listed at the top of invoices but almost never paid by wholesalers, but were instead meant to report a price suitable for such estimation, that is, *a real price.*

█ Viewing the facts in the light most favorable to the Commonwealth, and drawing all reasonable inferences in its favor, the Court concludes there is sufficient evidence for a verdict for the Commonwealth, and as such, there still exists a genuine issue as to knowledge.

As for the Commonwealth's motion, "it is unusual to grant summary judgment on scienter" except in cases where " 'the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.' " *S.E.C. v. Ficken*, 546 F.3d 45, 51 (1st Cir.2008) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)). Here, the defendants have produced sworn testimony that they believed WACs to be

merely an invoice price and that they used it as such, as well as some evidence that some others understood WAC in the same way. The issue of defendants' knowledge will have to be resolved drug by drug, depending on numerous factors, including the percentage of drugs sold at the invoice price, the amounts of the spreads, and the duration of the spreads. Viewing the facts in the light most favorable to the Defendants, and drawing all reasonable inferences in their favor, the Court concludes there is sufficient evidence for a verdict for the Defendants, and as such, there still exists a genuine issue as to scienter.

### C. *Count III*

Defendants also move for summary judgment on the claims under the Massachusetts Medicaid False Claims Act, Mass. Gen. Laws ch. 118E, §§ 40–41 (Count III). That act provides that "Any person who furnishes items or services for which payment may be made under this chapter, who: ... (2) knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to [a Medicaid] benefit or payment [is liable]." Mass. Gen. Laws. ch. 118E, § 40. The defendants are persons who furnish items for which payment may be made under the chapter. Additionally, the Commonwealth must establish that the defendants made false statements for use in determining rights to a Medicaid payment, and that the statements were made knowingly and willfully. For an act to be willful, it must be the "voluntary, intentional violation of a known legal duty." *Commonwealth v. Kingston,* 46 Mass.App.Ct. 444, 706 N.E.2d 1153, 1154 (1999).

As discussed above, having entered into the rebate agreements, the defendants were required, as a matter of law, to familiarize themselves with the legal requirements, standards and procedures of the Medicaid program, *Heckler,* 467 U.S. at 63–65, 104 S.Ct. 2218, including the procedures and legal requirements applicable to reimbursements. *Mackby,* 261 F.3d at 828. The defendants thus knew or were recklessly indifferent to their legal obligations. The Commonwealth has produced significant evidence permitting the inference that the manufacturers knew the published WACs were false and thus that the manufacturers knowingly and willfully made false statements or representations when they reported their WACs. Viewing the facts in the light most favorable to the Commonwealth, and drawing all reasonable inferences in that party's favor, the Court concludes there is sufficient evidence for a verdict for the Commonwealth as to claims submitted during the time periods in which defendants were reporting WACs, and as such, there still exists a genuine issue as to whether the defendants acted knowingly and willfully during those time periods. Thus the defendants' motion as to Count III must be denied as to those claims. For the claims submitted during periods in which the defendants reported only AWP, the defendants' motion as to Count III must be granted for the reasons outlined above.

### D. *Count I: Common Law Fraud*

Defendants also move for summary judgment on the claims of common law fraud (Count I). "The elements of [intentional] misrepresentation are well established: in order to recover, plaintiff 'must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage.'" *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1471–72 (1st Cir. 1996) (quoting *Barrett Assocs., Inc. v. Ar-*

*onson,* 346 Mass. 150, 190 N.E.2d 867, 868 (1963)).

### 1. Falsity, Materiality, Intent, and Damages

The Commonwealth must prove that the defendant made a false representation to hold the defendants liable for fraud. "[I]n Massachusetts ... a party who discloses partial information that may be misleading has a duty to reveal all the material facts he [or she] knows to avoid deceiving the other party." *Id.* at 1478 (quoting *Nei v. Burley,* 388 Mass. 307, 446 N.E.2d 674, 676 (1983)).

> Although there may be "no duty imposed upon one party to a transaction to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies."

*Kannavos v. Annino,* 356 Mass. 42, 247 N.E.2d 708, 711–12 (1969) (quoting Fowler V. Harper et al., *The Law of Torts,* § 7.14 (date unavailable)). As discussed above, defendants reported WACs that were grossly out of whack with the prices that were actually paid. By reporting false WACs, or by reporting false WACs without divulging the true nature of the prices they were reporting, the defendants made false representations sufficient to constitute fraud.

The Commonwealth must also prove that the falsely represented facts were material. For a fact to be material, it must have the tendency to do harm so that the damage to the plaintiff flowed directly from the misrepresentation. *See, e.g., Dawe v. Morris,* 149 Mass. 188, 21 N.E.

313 (1889). "Materiality depends upon whether a reasonable man would attach importance to the fact not disclosed in determining his choice of action in the transaction in question." *St. Paul Fire and Marine Ins. Co. v. Ellis & Ellis.,* 262 F.3d 53, 61 n. 9 (1st Cir.2001) (internal quotation marks omitted). In particular, information has been found material where it "concerns the purpose, safety, efficacy, or *cost,* of the product or service." *F.T.C. v. Direct Mktg. Concepts, Inc.,* 569 F.Supp.2d 285, 299 (D.Mass.2008) (quoting *Novartis Corp. v. Fed. Trade Comm'n,* 223 F.3d 783, 786 (D.C.Cir.2000)) (emphasis added). Here, the defendants reported false prices for drugs, knowing the Commonwealth based its reimbursement on such prices, and the Commonwealth reimbursed accordingly. The falsely represented WACs were material.

The Commonwealth must also show that the defendants possessed a fraudulent intent. Under Massachusetts law, "fraudulent intent may be shown by proof that a party knowingly made a false statement and that the subject of that statement was susceptible of actual knowledge. No further proof of actual intent to deceive is required." *Fisch v. Board of Registration in Medicine,* 437 Mass. 128, 139, 769 N.E.2d 1221, 1230 (2002) (citation omitted). "It is sufficient to show 'proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge'; *actual intent to deceive on the part of the defendants need not be shown." Russell v. Cooley Dickinson Hosp., Inc.,* 437 Mass. 443, 458–459, 772 N.E.2d 1054, 1066 (2002) (quoting *Powell v. Rasmussen,* 355 Mass. 117, 118, 243 N.E.2d 167 (1969)) (emphasis added). Here, the defendants made false statements, and the subject of those state-

ments was quite susceptible to knowledge by the defendants. As discussed above, viewing the facts in the light most favorable to the Commonwealth, and drawing all reasonable inferences in that party's favor, there is sufficient evidence for a jury to find that the defendants knew that their statements as to WAC were false, and as such, there still exists a genuine issue as to whether the defendants acted knowingly.

The Commonwealth must also prove that it sustained actual damages resulting from the defendants' misrepresentation. *See Poly v. Moylan,* 423 Mass. 141, 667 N.E.2d 250 (1996). Here, had the defendants reported truthful prices, the Commonwealth would have paid significantly less to the pharmacies that submitted the claims. Instead, the Commonwealth paid massively inflated amounts to the pharmacies. The Commonwealth has thus sustained actual damages as a result of the defendants' misrepresentations.

### 2. Reasonable Reliance

█ The Commonwealth must also prove that it relied upon the representations as true. Given that the Commonwealth expended untold millions paying for the drugs at issue, viewing the facts in the light most favorable to the Commonwealth, and drawing all reasonable inferences in that party's favor, there is sufficient evidence for a jury to find that the defendants relied on the defendants' false statements.

The Commonwealth's reliance must also be reasonable. *See Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,* 438 Mass. 459, 467, 781 N.E.2d 787 (2003). The reasonableness of reliance is a question of fact. *Rodi v. Southern New England School of Law,* 389 F.3d 5, 16 (1st Cir.2004). Only when a jury concludes that the falsity was "readily apparent" or "obvious," is reliance unreasonable. *See*

*Scalli v. Citizens Financial Group, Inc.,* 2006 WL 1581625 at *12 (D.Mass.2006). Further, "it is well established under Massachusetts law that 'failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation.'" . . . Only reliance on "preposterous or palpably false" representations vitiates a misrepresentation claim.' *Damon,* 87 F.3d at 1480 (citations omitted). However, "a person who is confronted with inconsistent or contradictory representations may not reasonably rely on one side of the controversy without attempting to resolve the inconsistency or contradiction." *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.,* 62 F.Supp.2d 236, 242–43 (D.Mass.1999) (citing *Trifiro v. N.Y. Life Ins. Co.,* 845 F.2d 30, 33 (1st Cir.1988)).

Defendants argue that Massachusetts knew or should have known that WAC was not a net price, or could have learned so by using URAs to calculate AMPs, and so Massachusetts could not have reasonably relied on it as a true price. As discussed above, however, the Commonwealth's knowledge as to the falsity of the defendants' WAC was not nearly as significant as the defendants suggest. Further, as the Commonwealth's expert, Raymond Hartman declared,

[a]lmost all publicly available information appearing through the end of the Damage Period suggested that participants and informed analysts of these markets believed that WAC + x%, where x% was reasonably small, provided a good approximation of the actual drug acquisition cost for retail pharmacies. The only information that I have seen to the contrary is that found in the March 2002 OIG Report discussed . . . above. That information was certainly insufficient to have altered the Common-

wealth's reimbursement practices through 2003:Q1.

(Hartman Decl. ¶ 31e.) Further, the ability to make a mathematical calculation based on URAs does not mean that Massachusetts could not have reasonably relied on the reported WACs, for "under Massachusetts law ... 'failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation.'" *Damon*, 87 F.3d at 1480.

Massachusetts attempted to obtain accurate pricing data following the 2002 report, but pharmacies refused to provide any data, leaving Massachusetts to attempt to tinker with the WAC-based system. *See Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 52, 59 (1st Cir.2004).

The Commonwealth has submitted a wealth of evidence that it did rely on the WACs submitted by the defendants and that, in light of numerous publications defining WAC as an actual price, such reliance was reasonable. Viewing the facts in the light most favorable to the Commonwealth, and drawing all reasonable inferences in that party's favor, there is sufficient evidence for a jury to find that the Commonwealth did not know of the falsity of the reported WACs at all until. the OIG report in March, 2002, and that reliance was reasonable until the end of the relevant period.

### 3. Other Issues

Finally, Defendants argue that for those instances in which Massachusetts reimbursed above the FUL, Massachusetts cannot prove that the WACs affected the reimbursement. Massachusetts argues that these instances are isolated administrative errors.[6] If the error consisted solely of a failure to take into account FULs, the correct FUL would limit damages but would not absolve defendants of liability.

### E. *Count VI: The Covenant of Good Faith and Fair Dealing*

▮ The defendants move for summary judgment on the Commonwealth's claim that by reporting false prices, the defendants violated the covenant of good faith and fair dealing implicit in the rebate agreements. The covenant of good faith and fair dealing means "that neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Speakman v. Allmerica Financial Life Ins.*, 367 F.Supp.2d 122, 132 (D.Mass.2005) (quotation marks omitted). "A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract. Otherwise, the implied covenant would be a mere redundancy." *Id.* (citations omitted). According to the Restatement (Second) of Contracts, "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party...." *Id.* at § 205, cmt. a. "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." *Speakman*, 367 F.Supp.2d at 132. However, the "requirement of good-faith performance ultimately is circumscribed by the obligations—the 'fruits'—actually contained in the agreement." *AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir.2001). And thus "the covenant may not be invoked to create rights and duties not contemplated by the provi-

---

**6.** Massachusetts filed an amended exhibit list claiming to correct certain of these errors.

sions of the contract or the contractual relationship." *Speakman,* 367 F.Supp.2d at 132.

Under the rebate agreements, each manufacturer reports AMPs to CMS for each of its drugs. AMP is defined in the agreement as "the average unit price paid to the Manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade," which "includes cash discounts and all other price reductions." CMS uses the AMP data to calculate a Unit Rebate Amount (URA) for each drug, typically 11% of the AMP for generic drugs, and sends this data to the states, including the Commonwealth. The Commonwealth then uses URAs to invoice manufacturers for rebates based on drug quantities.

■ The defendants argue that the only intended fruit of the agreement was the receipt of the URAs, themselves, which were defined in terms of AMP, and the fact that they were unrelated to the prices paid by the Commonwealth is, to put it simply, not their problem. But that argument understates the purpose of the agreements. As the defendants point out, "[t]he express and essential purpose of the Medicaid rebate program is to give the state Medicaid programs the benefit of the best price at which the manufacturer sells the drug to any public or private purchaser." The reasonable expectations of the parties were not simply that the agreements would give the Commonwealth the raw amount of the URAs, but rather that they would return some percentage of the Commonwealth's expenditures, to make sure that the Commonwealth was treated at least as favorably as any other provider. By reporting falsely inflated WACs simultaneously with true (and significantly lower) AMPs, the defendants violated the

parties' reasonable expectations by transforming the rebate agreement from something that gave the Commonwealth an approximately 10% discount on the price (taking into account profits for the wholesaler and pharmacy) into something that gave the Commonwealth amounts entirely unrelated to (and a much smaller percentage of) the price it was paying for the drugs. Furthermore, by reporting false WACs, the defendants sabotaged any chance the Commonwealth had for getting "the benefit of the best price at which the manufacturer sells the drug." As they gave with one hand, they took away far more with the other, swamping any benefit of the agreement to the Commonwealth by causing the Commonwealth to pay out extra amounts many times the size of the URAs.

There is sufficient evidence for a jury to find that the defendants breached the covenant of good faith and fair dealing implicit in the rebate agreements during the periods in which they reported false WACs.[7]

### F. *Statute of Limitations*

The defendants argue that all of the Commonwealth's claims are limited by the statute of limitations. The fraud claims are subject to a three-year statute of limitations. Mass. Gen. Laws ch. 260, § 2A. The MMFCA claims and the contract claims are subject to a six year statute of limitations. Mass. Gen. Laws ch. 118E, § 44; Mass. Gen. Laws ch. 260, § 2. Under the discovery rule, none of the statutes of limitation begin to run until the Commonwealth discovered, or reasonably should have discovered, that it had sustained appreciable harm as a result of the defendant's conduct. *Kennedy v. Goff-*

7. For the periods in which the defendants reported only AWP, however, the defendants' motion as to Count VI must be granted for the reasons outlined above.

*stein*, 62 Mass.App.Ct. 230, 232, 815 N.E.2d 646, 648 (Mass.App.Ct.2004). The MFCA has a discovery rule built into the statute: MFCA claims must be brought within six years after the violation occurred, or within three years after the facts material to the right of action are known or reasonably should have been known by the official within the office of the attorney general charged with responsibility to act in the circumstances, whichever occurs later. Mass. Gen. Laws. ch. 12, § 5K(1). The initial complaint was filed in September 2003.

It is unclear on this record when the Commonwealth reasonably should have discovered that WACs were not true prices. While the Commonwealth discovered that the reported WACs were false in 2001 or 2002, arguably the GAO report in 1995, the VenA–Care meeting in 1998, or even Mr. Shapiro's work in 1988 should have put the Commonwealth on enough notice that it should have conducted an investigation. The Court will have to address statute of limitations—what the government should have known, and when it should have known it—drug-by-drug.

### ORDER

The Commonwealth's cross-cutting motion for summary judgment [Docket No. 434] on Count IV is **DENIED.** The defendants' joint motion for summary judgment [Docket No. 450] is **DENIED** except with respect to the AWP based claims.